UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

ERIC LESUEUR,

    Petitioner,

  v.                                              Case No. 14-CV-402

BRIAN FOSTER,

    Respondent.

## DECISION AND ORDER DENYING PETITION FOR
## WRIT OF HABEAS CORPUS AND DISMISSING CASE

    A Milwaukee County jury convicted Eric Lesueur of seven counts of recklessly endangering safety while armed and one count of being a felon in possession of a firearm. He was sentenced to an aggregate of twenty-three years prison to be followed by seventeen and one-half years extended supervision. Lesueur seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254. He argues that his conviction and sentence are unconstitutional because his trial counsel was ineffective. For the reasons I explain below, the petition for writ of habeas corpus will be denied and the case dismissed.

### BACKGROUND

    In August of 2008, police arrested Lesueur for endangering safety by shooting a gun at a group of seven people outside a liquor store in Milwaukee. At Lesueur's trial, two witnesses, Anthony Vaughn and Darrell Nicholson, Sr., identified Lesueur as the shooter. Lesueur's counsel failed to obtain and use a recorded police interview of Nicholson to impeach him at trial. This failure is the crux of Lesueur's habeas petition.

Nicholson, the owner of the liquor store, was amongst the group shot at and was the one to call 911 to report the shooting. (Docket # 1-2 at 2.) When police arrived, however, they arrested Nicholson for carrying a concealed weapon after they found a handgun in his truck. (*Id.*) At the station, the police interviewed Nicholson. The interview was recorded and summarized in a police report. Most relevant to Lesueur's habeas petition, the police report stated that Nicholson told the police that he never saw who fired the shots. (Docket # 8-2 at 63-64.) The police report also indicated that the interview was recorded using a digital audio recorder which was transferred to a CD and placed on inventory. (*Id.*)

Lesueur's counsel was provided the police report summary as part of discovery but he was not provided or obtained the recorded interview until Nicholson had already testified at the trial. (Docket # 8-10 at 117-18.) In the recorded interview, Nicholson did talk about Lesueur, using his nickname "Gold" and "Goldie." (Docket # 8-14.) But he did not identify Lesueur as the shooter. (*Id.*)

At trial, however, Nicholson identified Lesueur as the shooter. Specifically, he testified as follows. He closed his liquor store with the help of his brothers, his son, and his employee, Anthony Vaughn. They "all proceeded to leave at about 9:30 p.m." when they "heard one shot go off. And after that . . . there was several shots that started to go off." (Docket # 8-9 at 63-64.) At first, he did not recognize the shooter, but when there was a break in the shooting, he noticed that his "son was shot" so they "got him in the car" and "[w]hen I got ready to get in the truck, an individual came out . . . and started shooting at me." (*Id.* at 67.) He then saw that the shooter was Lesueur. (*Id.* at 68.) He testified that he told the police that Lesueur was the shooter at the scene "when the detecs [sic] had me sitting there talking, about maybe 15 minutes after the shooting." (*Id.* at 78-79.) Lesueur's

2

counsel did not cross-examine Nicholson on the discrepancy between his trial testimony and his recorded police interview. Nor did he use the police report summary to impeach Nicholson. (Docket # 8-10.)

As to the other eye-witness, Anthony Vaughn, who worked at the liquor store, testified as follows. He was helping close the store and as he was locking up he heard "[j]ust a bunch of shots, whole lot of shots." (*Id.* at 34.) "At first, I didn't know where any of the shots [were] coming from there was so many of them." (*Id.* at 35.) "I stepped in my little doorway. I was looking. Then that is when I see [sic] Gold standing across the street next to the day care over there changing clips." (*Id.* at 35-36.) "Then I seen him shoot again, yes." (*Id.* at 37.) On cross-examination, Lesueur's counsel brought out the fact that Vaughn did not report to the police that Lesueur was the shooter until more than a week after the shooting. (*Id.* at 52.) Additionally, Lesueur's counsel offered the testimony of Angela Bradley who testified that Vaughn told her that Nicholson paid him to lie at trial. (Docket # 8-11 at 26.) During his testimony, Vaughn denied being paid to lie. (Docket # 8-10 at 45-46.)

Other than Nicholson and Vaughn, the only other witness relevant to the identification of the shooter was Detective Thompson. Detective Thompson testified that he was made aware of Nicholson's identification of Lesueur at some point subsequent to the night of the shooting but couldn't remember when exactly that was. (Docket # 8-10 at 103.) He went on to testify that he found out specifically about Lesueur being named as the shooter at the scene. (*Id.*)

The jury convicted Lesueur on all counts. Lesueur filed a post-conviction motion arguing that if Nicholson's CD recording had been turned over before trial, the defense

3

lawyer could have used it to impeach Nicholson's trial testimony. The trial court denied the motion, finding that Lesueur had not established prejudice because: (1) the defense had the report summarizing the CD that could have been used to impeach Nicholson; (2) Lesueur's trial lawyer had the CD recording during the trial, and thus had "enough time that he could have still used [the CD] to whatever extent he wanted to use it"; and (3) the CD recording focused mostly on Nicholson's gun, about "who was shooting Darrell Nicholson's gun . . . . There's no discussion . . . . except in a very limited way of who was shooting at" the seven victims. (Docket # 1-2 at 4.)

Lesueur appealed to the Wisconsin Court of Appeals both his conviction and the denial of his post-conviction motion. The Wisconsin Court of Appeals found Lesueur did not suffer prejudice from his counsel's errors (and because it found that there was no prejudice, it did not address whether or not Lesueur's counsel's performance was deficient). (*Id.* at 8-9.) The court of appeals agreed with the trial court's finding that Lesueur's attorney had an opportunity to listen to the recording and could have "used it to whatever extent he wanted to use it," such as re-calling Nicholson. (*Id.* at 8.) The court of appeals also reiterated the trial court's finding that the "salient aspects of the recorded interview were merely cumulative to the information in the [written report] of the recorded interview." (*Id.* at 8-9.) It also found the contents of the CD recording "largely inconsequential." (*Id.* at 9.) Lesueur filed a petition for review in the Wisconsin Supreme Court, which was denied. Subsequently, Lesueur timely filed this petition for writ of habeas corpus.

## ANALYSIS

Lesueur claims that the Wisconsin Court of Appeals, the last court to look at his case, made two errors, one under 28 U.S.C. § 2254(d)(1) by unreasonably applying

4

*Strickland v. Washington*, 466 U.S. 668 (1984) and another under 28 U.S.C. § 2254(d)(2) by unreasonably determining the facts. Different standards govern these two clauses. Under 28 U.S.C. § 2254(d)(1), a decision is "contrary to" clearly established federal law if the rule the decision applies differs from governing law set forth in Supreme Court cases, *Bell v. Cone*, 535 U.S. 685, 694 (2002), and a decision involves an "unreasonable application" of Supreme Court precedent if the decision, while identifying the correct governing rule of law, applies it unreasonably to the facts of the case, *Williams v. Taylor,* 529 U.S. 362, 407 (2000). Under 28 U.S.C. § 2254(d)(2), a decision "involves an unreasonable determination of the facts if it rests upon fact-finding that ignores the clear and convincing weight of the evidence." *Goudy v. Basinger*, 604 F.3d 394, 399-400 (7th Cir. 2010) (citing *Ward v. Sternes*, 334 F.3d 696, 704 (7th Cir. 2003)).

    1.    *28 U.S.C. § 2254(d)(1)*

Lesueur argues that the court of appeals required not only that he show a "reasonable probability of a different result" to prove prejudice under *Strickland*, but also required that he show the result of the trial was unreliable and that this second requirement resulted in an unreasonable application of *Strickland*.

As an initial matter, although Lesueur frames this as an unreasonable application of *Strickland*, because he challenges how the state court characterized the governing law, I will address this as a "contrary to" issue. Again, a state court decision is "contrary to" federal law, as determined by the Supreme Court, if it conflicts with or is substantially different from relevant precedent of the Court (i.e., *Strickland*). *See Williams*, 529 U.S. at 405. Mischaracterizing the governing legal principle, as Lesueur alleges, results in a state court decision "contrary to" the relevant precedent. *Id.* at 397.

5

In outlining the law governing the prejudice prong of the *Strickland* analysis, the court of appeals wrote:

> To prove prejudice, a defendant must demonstrate that the lawyer's errors were so serious that the defendant was deprived of a fair trial and a reliable outcome. [*Strickland*], 466 U.S. at 687. Thus, in order to succeed on the prejudice aspect of the *Strickland* analysis, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." [*Id.* at 694.] . . . In decisions following *Strickland*, the Supreme Court has reaffirmed that the touchstone of the prejudice component is "'whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair.'" *State v. Smith*, 207 Wis. 2d 258, 276, 558 N.W.2d 379, 386 (1997) (citations and quoted source omitted).

(Docket # 1-2 at 7-8.) The Wisconsin Court of Appeals concluded that even if Lesueur's attorney's failure to obtain and use the CD recording to impeach Nicholson constituted deficient performance, "Lesueur had a fair trial, and there is no reasonable likelihood of a different outcome on retrial if the defense lawyer obtained the CD recording earlier." (*Id.* at 9.)

As quoted above, the court of appeals began its summary of the relevant law with reference to a sentence in the *Strickland* decision, noted by the Seventh Circuit in *Eckstein v. Kingston*, 460 F.3d 844, 850 (7th Cir. 2006), that contemplates prejudice as a showing that the trial was unfair and its result was unreliable. It then cited the "reasonable probability of a different result" language and it concluded with a citation to a Wisconsin Supreme Court case that lists the "touchstone" of the ineffective assistance inquiry as fairness and reliability. But as *Eckstein* points out, what matters is how the court of appeals reached its conclusion. *Id.* at 851. And here, the court based its decision on the likelihood of a different outcome. It

6

found that the "salient aspects of the interview were merely cumulative" to the summary of the interview Lesueur's counsel had and that the contents of the recording were "largely inconsequential." The court concluded that "not having the recording before trial did not make a difference and does not make the trial unreliable." While the court mentions reliability (and fairness), the heart of its decision rests of the likelihood that the outcome of the trial would have been different had Lesueur's attorney had the CD recording prior to the beginning of trial. While the standard a defendant must meet to show prejudice in an ineffective assistance of counsel analysis concerns the question of the likelihood of a different outcome, *see Goodman v. Bertrand*, 467 F.3d 1022, 1027-28 (7th Cir. 2006) (clarifying the ineffective assistance of counsel standard post *Lockhart v. Fretwell*, 506 U.S. 364 (1993)), "occasional references to reliability do not undermine [a state court's] holding. *Strickland* itself states that to show prejudice one must demonstrate 'that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.' Furthermore, what is important is that the overall reasoning is consistent with *Strickland*," *Eckstein*, 460 F.3d at 851 (internal citations omitted). Thus, the references to reliability are not sufficient to result in a decision "contrary" to *Strickland*. Accordingly, Lesueur has not shown that the court of appeals' decision is contrary to or in conflict with *Strickland* entitling him to relief under 28 U.S.C. § 2254(d)(1).

    2.    *28 U.S.C. § 2254(d)(2)*

In regards to § 2254(d)(2), Lesueur argues that the court made three unreasonable determinations of fact: first, that his defense attorney had an opportunity to play the recording and could have used it to whatever extent he wanted to use it; second, that the salient aspects of the recording were merely cumulative to the information in the summary

7

counsel already had; and third, that the contents of the CD were largely inconsequential. As stated earlier, a decision "involves an unreasonable determination of the facts if it rests upon fact-finding that ignores the clear and convincing weight of the evidence." *Goudy*, 604 F.3d at 399–400 (7th Cir. 2010) (citing *Ward*, 334 F.3d at 704). Factual determinations made by the state court are presumed correct and the petitioner has the burden of rebutting the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

Turning to the first factual finding challenged by Lesueur—that his defense attorney had an opportunity to play the recording and could have used it to whatever extent he wanted—I agree with Lesueur that this finding is not supported by the record. Trial counsel received the recording after Nicholson had testified. While it is true that he could have recalled Nicholson to the stand, the trial judge made it clear more than once that if defense counsel wanted to play the recording the next day at trial, a transcript was required. (Docket # 8-5 at 6-7.) Thus, trial counsel was not free to use the recording to "whatever extent he wanted."

However, I disagree with Lesueur as to the other two findings by the state court. First, the state court's finding that the "salient aspects of the recording were merely cumulative to the information in the summary counsel already had" was not unreasonable and against the clear weight of the evidence. The police summary of Nicholson's interview did not mention Lesueur by name. As stated earlier, in relevant part, it states that Nicholson did not know who the shooter was. In the recorded interview, Nicholson does refer to Lesueur twice by his nickname ("Gold" or "Goldie"). (Docket # 8-14 at 8-10, 28.) He stated that he recognized Lesueur among a group of "maybe 5 guys" who were in an altercation with his nephew-in-law. (*Id.* at 8.) He also related that he saw Lesueur near his store around

8

Case 2:14-cv-00402-NJ   Filed 12/28/16   Page 8 of 15   Document 23

closing time and felt like the "same thing was starting up." (*Id.*) But he never implicated Lesueur as the shooter during his interview.

On this record, while Lesueur's point that with the recorded statement he would have been able to show that Nicholson talked about him and had the opportunity to identify him as the shooter and did not do so (contrary to his trial testimony) is well-taken, the state court was not unreasonable to conclude that the fact that Nicholson had not identified the shooter—which includes not identifying Lesueur—was the "salient" fact and that this fact was documented in the police summary. In other words, while the recording had more details to work with, trial counsel had in his possession the police report which contradicted Nicholson's testimony identifying Lesueur as the shooter.

The same is true of the other inconsistencies between the details Nicholson testified to at trial and the details he offered in the recorded police interview. While Lesueur is correct that trial counsel could have used the recorded statement to impeach Nicholson with those inconsistencies and chip away at his credibility, the court of appeals did not unreasonably determine that the salient or most valuable impeachment material was that Nicholson did not identify anyone, including Lesueur, as the shooter during the police interview. And this fact was already contained in the police summary.

Relatedly, Lesueur argues that the state court's finding that the contents of the CD were "largely inconsequential" was unreasonable. On habeas review, the reasonableness of the state court's findings does not turn on whether the federal court agrees with the state court or would have made the same finding in the first instance. *See Marshall v. Lonberger*, 459 U.S. 422, 432 (1983) (stating that deference to a state courts' factual findings "requires that a federal habeas court more than simply disagree with the state court before rejecting its

9

factual determinations"). Here, the court's opinion that the content of the CD were "largely inconsequential" followed its statement that "the salient aspects of the recorded interview were merely cumulative to the information in the police summary of the recorded interview, which had been turned over before trial and could have been used to impeach Nicholson." As discussed above, it was not unreasonable for the court to view the salient fact as the fact that Nicholson did not identify the shooter in the recorded statement (which of course included not identifying Lesueur). Stated differently, the court reasoned that the critical point for impeaching Nicholson was that he did not identify anyone as the shooter when he spoke to the police. That fact (not identifying anyone as the shooter, including Lesueur) was already reflected in the police summary which defense counsel had. In that sense, the content of the CD was "inconsequential" because the salient fact that Nicholson did not identify the shooter was already reflected in the police report.

Lesueur argues that a short police report summary cannot replace a 40-minute recorded interview. I agree. But in context of the critical trial issue in this case (whether Nicholson had identified Lesueur as the shooter), the court of appeals' finding that the recording which showed that Nicholson had not identified Lesueur as the shooter was inconsequential because the police summary had already reflected that Nicholson had not identified Lesueur as the shooter was not unreasonable.

But even if Lesueur had established that the state court had unreasonably determined all three facts, the analysis would not end. Lesueur must still show that he is entitled to habeas relief. *See Aleman v. Sternes*, 320 F.3d 687, 690 (7th Cir. 2003); *see also Harrison v. McBride*, 428 F.3d 652, 665 (7th Cir. 2005) (citing *Aleman*, 320 F.3d at 690) ("[E]ven when the AEDPA standard does not apply—either because the state court's opinion was

10

unreasonable or because the state judiciary did not address the constitutional claim—[a] prisoner still must establish an entitlement to the relief he seeks."). In this situation, § 2254(a) sets the standard: the court issues "a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." *See Aleman*, 320 F.3d at 690.

Looking at the totality of the record, as I must, Lesueur does not establish *Strickland* prejudice—that there is reasonable probability that but for counsel's unprofessional errors, the result of the proceedings would have been different. Recall that at trial, in addition to Nicholson, Anthony Vaughn identified Lesueur as the shooter. As the trial court noted at the post-conviction proceedings, Vaughn's identification of Lesueur was "very specific and detailed." (Docket # 8-15.) Vaughn testified that he worked at the liquor store. He identified Lesueur as "Gold" and as someone who came to the store regularly. (Docket # 8-10 at 33.) He testified that after closing the store, as he and some others were coming out and he was locking the gate, he heard a shot. (*Id.* at 34.) The shot hit the police telephone pole right in front of the store. He stepped around to the side of the building and then heard a "parade of shots" coming from all kinds of directions. Vaughn testified that at first he didn't know where the shots were coming from, then he saw Gold standing across the street next to the day care changing clips. (*Id.* at 35-36.) Then he saw him shoot again. (*Id.* at 37.) When asked about the distance between him and Gold when he saw him, he further testified "It's not that far away. I'm aware of him. I see him every day." (*Id.* at 39.)

Additionally, he testified that although it was in the evening, "There is a street light there. You can see everything." (*Id.*) When pressed as to how he identified Lesueur, Vaughn

11

testified that: "I recognize his build. I recognize him. I recognize him." The prosecutor pressed further and asked: "When you say you recognize him, do you mean you recognize his features, his face?" Vaughn answered: "Both." (*Id.* at 40.) He later added: "[W]hen you see someone all the time, you know him when you see him." (*Id.*) Vaughn also added that he also recognized Lesueur by his walk: "He just have a certain walk about himself." (*Id.* at 41.) Given the specific and detailed nature of Vaughn's testimony, a reasonable jury could have accepted his testimony even without the corroboration of Nicholson's testimony.

Lesueur argues that Vaughn was a flawed witness whose identification was buttressed by Nicholson's testimony. In essence, Lesueur argues that because Nicholson and Vaughn were the only witnesses to identify him, had Nicholson been properly impeached with the CD, Vaughn's identification would have been uncorroborated and there would have been a reasonable probability of a different outcome. I disagree. It is true that Vaughn had prior criminal convictions and more importantly had admitted to not reporting to the police that Lesueur was the shooter for eight days after the shooting. But Lesueur's argument about the weakness of Vaughn as a witness does not account for the fact that Vaughn gave the jury an explanation for not coming forward which a reasonable jury could have accepted. Vaughn testified that the night of shooting he was angry and did not want to talk to the police. (*Id.* at 44.) But later, when he learned how bad one of the victims was shot and how another was shot in the face, he decided to come forward. (*Id.*) He summarized his reasons for coming forward as follows: "For one, I was there." (*Id.* at 46.) He explained that because he was there his life was also put at risk. Additionally, he summed his reason: "Another reason, boy had a whole career. Boy was going to school, trying to do his school, do something with him. He had his whole life in front of him and it was interrupted." (*Id.*)

12

He closed with "an innocent man shot in the face didn't make no sense. It didn't make no sense." (*Id.*) It was within the jury's province to accept or reject this explanation.

It is also true that defense witness Angela Bradley testified that Vaughn told her that Nicholson was paying him to testify against Lesueur and that he in fact had not seen anything. (Docket # 8-11 at 27.) On cross-examination, Bradley testified that she took it upon herself to come to court to correct matters after she had been called by her cousin, Lesueur's girlfriend, and was asked to come to court to testify. (*Id.* at 28-29.) As with Vaughn, it was within the jury's province to accept or reject Bradley's testimony. Bradley's testimony was not so strong that no reasonable jury could not have credited Vaughn's testimony that he was not paid to testify over Bradley's testimony to the contrary.

Thus, even without Nicholson's corroboration, a reasonable jury was entitled to weigh and could have weighed Vaughn's testimony and concluded his identification of Lesueur sufficient. Lesueur urges that "Vaughn's word alone may very well not have convinced the jury beyond a reasonable doubt that Lesueur was the shooter." (Docket # 18 at 1.) But as discussed above, Vaughn's testimony was specific and detailed enough for a reasonable jury to have accepted his word alone. Additionally, the flaws that Lesueur identified in Vaughn as a witness—prior criminal convictions, delay in reporting to the police, and allegations that he was paid to lie—were all within the expertise of the jury to assess. Moreover, there is no requirement that the state proves identification with more than one witness. "[I]t is black letter law that testimony of a single eyewitness suffices for a conviction even if 20 bishops testify that the eyewitness is a liar." *Woods v. Schwartz*, 589 F.3d 368, 377 (7th Cir. 2009). Even without Nicholson's testimony or with Nicholson properly impeached, the jury still had to contend with Vaughn's testimony identifying

13

Lesueur as the shooter. Thus, Lesueur has not shown a reasonable probability of a different outcome. To be clear, Lesueur is not required to show that counsel's deficient conduct more likely than not altered the outcome of the case. *Strickland*, 466 U.S at 693. Rather, he merely has to show a probability sufficient to undermine confidence in the outcome. *Id*. at 694. Because Lesueur has not done so, he has not shown he is entitled to habeas relief under § 2254(a).

## CONCLUSION

Lesueur seeks habeas relief on the ground that his trial counsel was constitutionally ineffective. This decision is not about whether trial counsel was deficient. The state (correctly) conceded that point before the Wisconsin Court of Appeals. Rather this decision addresses whether under 28 U.S.C. § 2254(d)(1) the court of appeals used the correct governing law under *Strickland* in analyzing whether Lesueur was prejudiced by trial counsel's error. It did. More importantly, this decision concerns whether ultimately Lesueur has shown *Strickland* prejudice, a reasonable probability of different outcome absent trial counsel's error entitling him to habeas relief under 28 U.S.C. § 2254(a). Because he has not, he is not entitled to habeas relief.

## CERTIFICATE OF APPEALABILITY

According to Rule 11(a) of the Rules Governing § 2254 Cases, the court must issue or deny a certificate of appealability "when it enters a final order adverse to the applicant." A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To make a substantial showing of the denial of a constitutional right, the petitioner must demonstrate that "reasonable jurists could debate whether (or, for that matter, agree that) the petition

14

should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893, and n.4).

Reasonable jurists could not debate that Lesueur has not shown that the state court's decision was contrary to *Strickland*. Nor could reasonable jurists debate that Lesueur has not established *Strickland* prejudice. For these reasons, I will deny Lesueur a certificate of appealability. Lesueur retains the right to seek a certificate of appealability from the Court of Appeals pursuant to Rule 22(b) of the Federal Rules of Appellate Procedure.

**ORDER**

**NOW, THEREFORE, IT IS ORDERED** that the petition for a writ of habeas corpus (Docket # 1) is **DENIED**.

**IT IS ALSO ORDERED** that a certificate of appealability shall not issue.

**IT IS FURTHER ORDERED** that this case is dismissed. The Clerk of Courts is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 28th day of December, 2016.

BY THE COURT:

*s/Nancy Joseph*
NANCY JOSEPH
United States Magistrate Judge